17142

WALTER S. UTSEY, Respondent, v. ANDREW T. WILLIAMS
*ET AL.,* Appellants

(92 S. E. (2d) 159)

*Messrs. Hagood, Rivers & Young,* of Charleston, *for Ap-pellants,*

*J. D. Parler, Esq.,* of St. George, *for Respondent,* 

April 5, 1956.

OXNER, Justice.

This action stems from a collision between a Pontiac automobile driven by appellant and a Chevrolet truck driven by respondent, which occurred about 5:00 A. M. on July 27, 1953 on Highway No. 15 in the village of Grover, Dorcester County. The front of each vehicle was damaged in what the highway patrolman termed as "more of a head-on collison", and respondent and several occupants of the Pontiac received personal injuries. Alleging negligence, recklessness and willfulness on the part of appellant, respondent brought this action to recover actual and punitive damages, and the Pontiac automobile was attached. Appellant denied all charges of negligence and recklessness and set up a plea of contributory negligence, recklessness and willfulness. On the trial of the case, counsel for appellant timely made a motion for a nonsuit and later for a directed verdict upon the grounds that there was no proof of actionable negligence and that respondent was guilty of contributory negligence, willfulness and recklessness as a matter of law. These motions were refused. The jury returned a verdict in favor of respondent for $1,700.00 actual damages. Appellant thereupon made a motion for judgment *non obstante veredicto* or in the alternative for a new trial. This motion was also denied.

The effect of the verdict of the jury for only actual damages was to absolve appellant from the charges of reckless-

ness and willfullness. The question now is whether respondent was guilty of contributory negligence as a matter of law. If so, the motion for judgment *non obstante veredicto* should have been granted. *Taylor v. Atlantic Coast Line Railroad Co.,* 217 S. C. 435, 60 S. E. (2d) 889; *Mozingo v. Atlantic Coast Line Railroad Co.,* 220 S. C. 323, 67 S. E. (2d) 516.

In the village of Grover, Highway No. 15, which runs approximately north and south, is an asphalt road 54 feet wide with a line in the center. When the collision occurred about 5:00 A. M., it was dark and there was a misting rain. There were no street lights. Respondent resided in the village of Grover on the east side of Highway No. 15. Early on the morning of the accident he went to his brother's house and in returning home entered Highway No. 15 from a secondary road at a point several hundred feet north of his residence. When he reached Highway No. 15, he stopped and looked for approaching vehicles. His vision to the south extended a distance of approximately a tenth of a mile. There being no cars in sight, he entered said highway, made a sharp left turn and proceeded on the left side of the highway toward his home, driving closely to the curb. He says that when he had gone a distance of 75 or 80 feet, he noticed a car coming over the hill from the south at a speed estimated by him to be 60 miles an hour. He then stopped and put on his parking lights. Just before the collision the driver of the Pontiac turned to the right and then suddenly back to the left. According to respondent, the vehicles collided on the extreme east side of the highway. Respondent's only explanation for driving on the left side of the road was that it was more convenient to do so than to drive across the center, make a left turn and then drive several hundred feet and make another left turn into his yard. We take the following from his testimony.

"Q. Mr. Utsey, when you came up to that stop sign, you looked and saw nothing coming? A. No, sir.

"Q. And you could have gone on across the road couldn't you? A. Yes, sir, I could have.

"Q. As a matter of fact you traveled a hundred feet before this accident, didn't you? A. Seventy-five or a hundred.

"Q. It is only a fifty-four foot road? Is that correct? A. Yes, sir.

"Q. You could have gone across there the same time it took you to go down, couldn't you? Isn't that right? A. I guess so.

"Q. And you deliberately turned and went down the left side of the highway? A. I always did.

"Q. You deliberately did? Isn't that correct? A. Yes, sir.

"Q. You deliberately went down there? A. That is right.

"Q. When you were going down there, you were going to park in your yard, weren't you? A. Yes, sir.

"Q. You were going to park the truck in your yard when you got home? A. Yes, sir.

"Q. And is it easier to go in your driveway like that or to go across and wait for traffic before you turn into your driveway? A. Well, I would have to go fifty-four foot across and fifty-four foot back."

* * * * *

"Q. Now, Mr. Utsey, when did you first see this car that was coming? A. When it was coming across the hill.

"Q. How far away is that? A. About a mile, I mean about a tenth.

"Q. A tenth of a mile. You could have seen that car another tenth of a mile, couldn't you? A. Sir?

"Q. You could have seen that car coming for another tenth of a mile, couldn't you? You could have seen his lights? A. No, sir.

"Q. You could not have seen his lights? A. No, sir.

"Q. What would have kept you from seeing them? A. It was rainy, I guess, or something. I don't know.

"Q. But it was only a slight drop in that hill, wasn't it? A. Well, it was a drop; about a tenth of a mile.

"Q. It is a tenth of a mile from where the road intersects down to the hill, isn't it? A. Yes.

"Q. And then for another tenth you could see lights of a car coming at night, can't you? A. Yes, sir.

"Q. You did not see the lights coming? A. No, sir, it was raining. I guess that was the reason.

"Q. Did you have your windshield wiper working? A. Yes, sir.

"Q. Are there any street lights around there? A. No, sir."

The highway patrolman, who arrived at the scene several hours after the accident, said he smelled the odor of alcohol on respondent and that he "was still in a daze and had been drinking." As to this, respondent said: "I don't remember drinking any that night and I am positive I did not drink any that morning."

Appellant resided in Philadelphia and at the time of the accident was returning home from Boston, Georgia, with his wife and several relatives. He was unfamiliar with the highway. As he approached the village of Grover from the south, the highway widened from approximately 26 feet to 54 feet and there was a sign showing a speed zone of 35 miles per hour. He said that he saw the sign, reduced his speed from around 45 to 35 miles an hour, and when he first saw respondent's car it was approximately 300 feet ahead of him, near the center line, on the wrong side of the road, with the headlights shining in his face. He described what happened then as follows: "I tried to turn my car to the right because when I saw him I thought maybe there was a curve. I did not know. I started to turn right and I noticed that he was still coming into me. He was still coming left at me and I tried to turn further. I was trying to go to the right, thinking it was a curve and after I saw he was still coming into me, I went back the other way."

Appellant denied that respondent ever stopped and said he was still moving at the time of the collision.

It may be conceded that the testimony, when considered in the light most favorable to respondent, is sufficient to warrant a finding of negligence on the part of appellant, but we cannot escape the conclusion that the only reasonable inference warranted by the undisputed facts is that respondent was guilty of contributory negligence.

Although when respondent entered this heavily traveled highway at night in a misting rain, his vision to the south extended only a distance of a little over 500 feet, he made a sharp left turn in violation of Section 46-402 of the 1952 Code and proceeded south on the wrong side of the road, in violation of Section 46-381, and after driving about 100 feet collided with appellant's automobile on the latter's side of the highway. If, as respondent says, he stopped his car and turned on his parking lights, this must have occurred only an instant before the collision. When appellant, who was unfamiliar with the highway, observed the headlights of respondent's car he had a right to assume, in the absence of circumstances which would reasonably give notice to the contrary, that respondent was on the right side of the highway. *Myers v. Evans,* 225 S. C. 80, 81 S. E. (2d) 32; *Padgett v. Brangan,* 228 Ky. 440, 15 S. W. (2d) 277. In the nighttime drivers frequently judge the position in the road of other motor vehicles by the headlights. *Edblad v. Brower,* 178 Minn. 465, 227 N. W. 493. Respondent thus brought about a dangerous situation easily calculated to confuse those meeting him. As stated in *Purdie v. Brunswick,* 20 Wash. (2d) 292, 146 P. (2d) 809, 812, " 'one who violates the law of the road by driving on the wrong side assumes the risk of such an experiment and is required to use greater care than if he had kept on the right side of the road.' "

There was testimony to the effect that some of the local people frequently drove in the village of Grover on the left side of the road and parked near the curb, but it is undisputed that there were no parking marks and appellant had no rea-

son to assume that any such custom existed. "It has been held that a mere custom of driving on the left side of a street or highway at a particular point will not justify violation of a statute or ordinance requiring vehicles to keep to the right." 60 C. J. S., Motor Vehicles, § 282.

In *Sanders v. State Highway Department,* 212 S. C. 224, 47 S. E. (2d) 306, the plaintiff was held guilty of contributory negligence as a matter of law in driving on the left side of the highway while approaching a curve on a country road, although there was evidence that those in the community frequently did so because the right side was so worn and washed that it was difficult to travel thereon.

Reversed and remanded for entry of judgment in favor of appellant.

STUKES, C. J., and TAYLOR, LEGGE and MOSS, JJ., concur.